Progressive Democrats for Social Justice v. Bonta. Good afternoon, Your Honor. May it please the Court, my name is Charlie Gerstein, representing the Progressive Democrats for Social Justice, Carly Ware, and Krista Henneman, the plaintiff in this case. I'd like to reserve about five minutes for rebuttal, if that's okay with the Court. Thank you. California Government Code Section 3205 makes it a crime for one county employee to ask another county employee to contribute to a political campaign, but it permits a state employee to do the exact same thing, subject only to a less restrictive administrative system. That system, CalHR, is the core of the state's post hoc defense of a distinction without support in the legislative history, but it cannot do the work the state needs it to do for three key reasons. First, the state's less restrictive regime serves effectively the purposes that the state uses to justify Section 3205, which conclusively shows that Section 3205 is unnecessary to its purposes. Second—I just want to interrupt for one minute. Although the state says that there would be disuniformity, there could be, as far as you're concerned, there could be a state statute saying exactly what the Cal Human Resources Department regulations say. That's correct, and in fact, Your Honor, California Government Code Section 1990 says—authorizes state agencies to make rules, allows CalHR to approve or reject rules, and there's nothing stopping the state from imposing a literally identical regime on local employees, and I think it's important to point out— But wait a minute. That's different. I mean, that would allow the local localities to do what they wanted. It wouldn't impose a uniform standard, including not soliciting the workplace, not soliciting the people they manage, and so on, but there could be a statute like that, I presume. That's correct, Your Honor, and there could be a statute that simply subjects local employees to CalHR oversight as well. I think the court— Is that right? There's no reason to believe otherwise, either from the record or any source of law or— But CalHR has some bailiwick, which isn't, in general, supervising local employees. At the moment, that's correct, Your Honor, and there's—but the state could do either of two things in response to that observation. It could change CalHR's bailiwick itself, or it could simply mandate that local employees, local agencies, impose similar rules and similar oversight to provide the kinds of protections that the state believes to be sufficient for its own employees, and I think the— Can the state hire and fire local employees? I don't believe at the moment. I don't know whether there's any obstacle to the state giving itself that power, but it certainly does not have that power now, and I think the key point in response to Judge Berzon's question would be that the record reveals no obstacle to imposing the protections that the state believes to be sufficient for its own employees on local employees. There's no reason why, for example, the state couldn't simply say that local employees are required to provide certain kinds of human resources, oversight, certain kinds of complaint procedures to allow some small counties to have recourse to a state agency or a centralized local agency. There are many different things they could do, and instead what the state did, in the face of an observation from the governor's lead advisor on personnel matters at the time the bill was signed, that there is no justification for the distinction, is simply say it's a crime for state employees, but not—a crime for local employees, but not a crime for state employees, and under this Court's cases, the Service Employees International Union case, the Perry case, the Harwin case, and the Supreme Court's case in Discovery Networks, in First Amendment cases, the distinction itself must be justified, and the to achieve a substantial government interest. The discrimination itself, quote, must be so justified, and it must be justified on an independent basis, and I don't see how the state can do that here, given the state of the record. The most they appear to point to is—in the legislative record—is a letter by John Vasconcellos to another Assembly member whose first name is his last name, at Excerpt of Record 105, with the stray quotation, there are protections in response to an objection from the State Personnel Board as to the justification for this law. It's unclear what exactly Member Vasconcellos was referring to. Member Vasconcellos himself introduced the original bill without the distinction that we challenge here, and so there's really nothing in the legislative history to support the conclusion that this purported interest in uniformity, which, as Judge Berzon's first question at this hearing pointed out, could simply have been alleviated through less restrictive means. But the evidence wouldn't necessarily have to be in the legislative record. I mean, there could be an evidentiary record. There just isn't one particularly. That's correct, Your Honor, and at pages 134 through 136 of the Excerpts of Record, the state and the plaintiffs stipulated to the relevant facts, and they stipulated that after a diligent search, the state has identified no instances where state employees' conduct of the kind that is forbidden by Section 3205 caused harm of the sort that they seek to criminalize as to our clients. So, indeed, we don't take the position, and I don't think there's support in the law for the position, that the record is confined to the legislative record itself in any strict sense, but there's nothing else on which this Court can base a decision in support of the state, because although we have the... To put this in terms of applicable review standards, there's a dispute in the fairly vigorous one about whether this is pickering, whether it's NTU standard, which seems to be a heightened version of pickering, whether it's strict scrutiny, or whether it's some... that is based on McCutcheon or something, which is heightened but not strict scrutiny. So there are four versions, right? Which one are you advocating for? It doesn't matter. I don't think it matters, is the first answer, because I think even granting the state the most forgiving version of that standard, which is pickering, there's no dispute that the version of pickering articulated in the NTU case would apply here, because this is an anti-restriction on speech, not a post hoc. But it's a criminal, it has a criminal enforcement, the state is not the direct employer of these people, but NTU is still a heightened scrutiny, a heightened standard from ordinary pickering. That's correct. Because of the ex-ante version, right? Then you don't actually ever argue for strict, strict scrutiny. That's correct, Your Honor. Would you explain that? I think because the case that seems most analogous to us is the Harwin case, and it doesn't specifically use that exact language. Instead, it says, as I just quoted, necessary to achieve a substantial government interest. And I suppose there's some distinction between substantial as used in that case and compelling as used in... And why is that the most relevant? Because it is a case that highlights the necessity of a justification for a distinction among speakers, which is what we have here. But at the same time, in response to Your Honor's question about pickering, indeed, this would be the first case, and the district court below is the first court ever to apply pickering of any form to a criminal statute, and particularly a criminal statute that doesn't regulate an employee-employer relationship between the entity that passed the rule and the plaintiffs. Here, of course, by definition, anyone subject to Section 3205 is not a state employee, as Judge Ikuda's question pointed out, and yet they are subject to criminal prosecution as required by the state for merely asking a colleague entirely separately from work, outside of work, without mentioning work, without any work resources, without any connection between the solicitation and work, no additional factors at all. It is a crime to simply ask another employee, potentially of a county as large as Los Angeles, for a political contribution to a nationwide political race, which I think serves to highlight, oh, excuse me, Judge Ikuda's question. The applicability of pickering, because pickering and the rationale behind pickering applies when there's a direct employee-employee relationship. And it didn't seem, and I think you agree, that there wasn't a direct employee-employee relationship here between the state and the local employees, that the state didn't have direct hiring or fire. They direct the activities of the local employees, so why do you think pickering is applicable, and is there any case for holding that pickering applies even when it's your employee, other than, I guess, contractors and vendors, but not a direct relationship? We don't think pickering applies, Your Honor. In response to Judge Berzon's question, we think we would win even if pickering applied, but we strongly believe that pickering does not apply for, among others, the reason that Your Honor just mentioned, which is the center of gravity, say, of Section 30205 is not an employment relationship between the state and the employees. In fact, it explicitly precludes such a relationship. So all of the justifications for pickering, which are that the employers need leeway to make discretionary judgments about the efficiency of their workplaces, which is also rationale mentioned in letter carriers and in Broderick, those don't apply here. This is a criminal statute, Our Claims Act. Well, you did say at the outset that it could. I mean, they could change the scheme, and the state does have complete control here, ultimately. Well, I don't know. Does it have complete control? Well, they don't at the moment have complete control, but your original representation that you could make CalHR in charge of local employees suggests that that could be revised. I think that's correct. I'm sorry. So local governments don't have any independent authority that's separate from the state, and the state could override that and hire and fire its employees and direct its employees directly. Wouldn't the California Constitution have to be changed to accomplish that? I don't know the exact answer relative to the specifics. I mean, it's very complicated in California as to a chart of cities. You know, I mean, there are different levels of local autonomy and so on. We certainly don't know the answer now, but your original response to the alternatives argument suggested that there was some leeway, and I don't know whether you know that. I don't know it. Well, I think the key— You know that, or is that just a surmise? I mean, do you specifically know that, in fact, the state could take control of the local government employees either through the HR department or otherwise? Let me put it this way. The record reveals, and I know of, no barrier to them doing that, and I don't think that would require that the state— But to go back to the original question, you wouldn't do it that way, presumably. You would simply pass a law that's statute that says that these are the rules for local employees, which you could do. Correct. There's no conceivable barrier to doing that, and I think the only point to make just before moving on is that such a law imposing CalHR oversight over local employees wouldn't mean that the state becomes their employer. It just provides the sorts of services that the state, in this case, points to as the sorts of things that make state employees differently situated from local employees, which is the mere presence— If pickering doesn't apply, what standard would apply to— state can 3205 in this way to local employees? Under what standard or lens would we look at it? We think the appropriate standard is close scrutiny, as described in McCutcheon, and as appears to be materially identical in Harwin, Perry, and the SEIU case, which is to say the state has to come forward with a compelling justification for why it is making the distinction that it is making between state and local employees. It has to support that distinction with some evidence, not merely conjecture or speculation, and it has to show that some reasonably less restrictive means are insufficient. But not quite strict scrutiny. As then-Judge Gorsuch put it in his concurrence in Riddle v. Hickenlooper for the Tenth Circuit, it's not quite strict scrutiny, but it's something close. It's unclear to me what exactly the fine distinction between— Well, the fit may be a little looser. I mean, no one's really contesting the compelling interest here, so we don't really have to worry about that very much. I think that's correct. We're not contesting the—just to be very clear, though—we're not contesting the compelling interest as to an even-handed statute. Right. That's governed by letter carries. You're saying there's no compelling interest for the distinction, right? That's correct. And another way of phrasing that, though, is showing that there's no compelling interest for this particular law as to local employees, because state employees have been doing just fine for 47 years without this law, right? So one way to look at this in a traditional strict scrutiny framework would be to say the law as to local employees is conclusively unnecessary, because materially identical employees— Specifically, what this bans is employees going to a co-employee of the, quote, agency, which could mean anybody in the city of Los Angeles, I gather, not in the workplace and not anybody who they're supervising and asking for a contribution. That's correct. And the example we used below and in the papers is a janitor for the county of Los Angeles and a prosecutor for the county of Los Angeles who might live 85 miles away from each other, have no common work at all, run into each other at a family barbecue on the weekend, and one asks the other to contribute to Joe Biden or Donald Trump's national political campaign that has nothing to do with their work and poses no conceivable threat to the independence of their jobs, whereas two state employees who sit next to each other in a crucially political job at the Office of Political Reform can have exactly the same interaction without penalty. If your honors have further questions, now I can answer them. I reserved a little time for rebuttal, but whatever it is. That's fine. Thank you. Thank you, Your Honor. Thank you, Your Honor. I would start by just saying the Supreme Court has long recognized that governments have an important interest in preventing political patronage and corruption in federal, state, and local government agencies. That all seems to be a given here, and one problem with your brief is that you spent a lot of time justifying the rule as if it were an even-handed rule, but it isn't. So the question is, why is the distinction valid? Well, Your Honor, I think if you look at the legislative history, as we said in our brief, the legislature made a determination in 1976 when they revised the statute to generally the form that is being challenged here. The legislature wanted to relax the restrictions that were previously imposed by the statutory regime, which at the time imposed the same and similar restrictions on state and local area agency employees. So in 76, they were going to repeal it altogether, but there was some pushback and some understanding that if they did that, there would be little regulation and control in many of the local area agencies because they didn't have the well-recognized civil service regime that was present for state employees, which gives state employees an opportunity to redress and challenge if they felt uncomfortable or they felt pressured to make a political donation. They have recourse. That's not guaranteed in all these local area agencies. You have to consider great variety, which is why we spent some time explaining the great variety of local area agencies in California, because there's no consistent regulation. There's lack of uniformity. So there may be some protections available in Los Angeles County, but those same protections aren't available, let's say, in Humboldt County. Well, then you could pass a rule for Humboldt County, not for Los Angeles. I mean, it does seem that when you're dealing, but also you could just pass these rules as a statute, right? You could just say local employees can't solicit from people they manage and can't solicit in the workplace and whatever else the Department of Human Resources rules are, right? But what the legislature chose to do here was to basically leave in place a time-tested provision that was already on the books, slightly modify it, and then change it so it would still apply to local area agency employees, because they still felt— I understand that, but the net result is a differential in what state and local employees can do politically, and what is the purpose of that? What is the justification for that? Well, the justification for that is there's already a system in place for state employees that regulates their conduct. And so what the legislature did was say there's still a problem in local area agencies that we have concerns about. We know we can regulate the field. We can regulate both state and local area agencies. That's not being contested. I think appellants acknowledged that if the state had said and left in place what was in 1976, that they wouldn't have the same challenge they have now, because there would be no differential treatment. So what the legislature did was say— I'm sorry, they would have the same challenge they have now? They would not have the same challenge, because there would be no equal protection claim, which is basically what they're focusing on. And I think what we wanted to emphasize in the briefing, what I want to emphasize here, is the state had the ability to regulate this conduct for state and local area employees. The state made a determination that it was no longer necessary to have this type of regulation for state employees, because they're— Well, but it does have—it has a regulation of almost everything, except it's more discreet. And it doesn't—what it doesn't do is ban people from soliciting contributions from other state employees if it's not in the workplace and it's not coercive and it's not this and that. And, I mean, that happens to be being done right now by a regulation. It could be done by a statute. So it didn't free—it only freed it up in one way, and it could do the same thing for local employees in that one way. Right, but what the state chose to do, it's regulating all the local area agency employees in the same way, for local area agency employees. Which it can do. Which it can do. It's uniform. It applies— Uniform, but it's uniformly differential with regard to how state employees are regulated, and it could be the same. It could be uniformly the same rather than uniformly different. As per the treatment of state employees versus local area agency employees. I think that's correct, but the legislation— That's not an explanation for the distinction. Well, the distinction was made because the legislature felt there was still a concern that needed to be addressed in local area agency employees, because absent this statute, there would be no regulation of the political conduct. Right. And the focus should be on whether or not the legislature has the ability to regulate this conduct. And I think the conclusion is, yes, they do. So the— Yes, they do, but the focus has to be on the distinction, no? It does have to be— They do have the authority, if they do it even handily, but there's a whole strain of First Amendment law that says you can't distinguish speakers from each other without some basis. Right, and the legislature had a basis, and I think you have to look at the collective record— What is the basis for the substantive difference, as opposed to the structural difference? The substantive difference is tied to the structural difference. They have to be looked at as one and the same, because the structure and the structural differences are part of the reason that the legislature made this distinction, because it recognized that the state civil service system was well-regulated, and there were protections in place for employees. Because this is just not a ban on political speech. It's also protecting the political rights of fellow employees. You're speaking a whole bunch of words, because the question ultimately is, why couldn't they do exactly what they did, except permit local employees to do the same thing that—No, ban the local employees exactly the way the state employees are banned, through a different route rather than through the HR, but through a statute, and leave open the same fairly narrow permission with regard to—What does that have to do with the uniformity? What does it have to do with the enforcement? There's a substance, and then there's the structural question. I don't know what they have to do with each other. Well, I think they're tied together, because— If you're saying that, could you explain why? I'm trying to, Your Honor. The point I'm making is that I don't think necessarily that's the standard that should be applied here, but to answer that question, the structure led to the legislature's conclusion that they needed to have something in place to address what was a concern for local agency or employees. So what you're asking and saying that there should be an alternative that they should have done differently is, in a sense, applying strict scrutiny to say, is this the best way to do it? And that's even—Appellants don't suggest that that's what we should be applying here. I mean, I think—Yes, Your Honor? I raise a concern with opposing counsel about whether pickering was applicable or not. And so there's some question in my mind about whether local government employees are employees of the state. So does the state have authority to hire and fire them and to direct their activities, or does it depend on what local government entity we're talking about? Can you clarify that? I can't address that, Your Honor. Counties, cities, and other local area agencies operate under the plenary authority and control of the state. And they're subject to the general laws of the state. What does that say about the employees, though? Who do the employees work for? Well, the employees do work for the local area agencies, but I think for constitutional analysis here, you have to look at that the state has the authority to regulate their conduct because they have— Can the state hire them? Can they fire them? And can they direct their activities on a day-to-day basis? In other words, give them assignments and the like? That's typically not the role of the state for local area agency employees. That's typically going to be determined by the local area agency. They have some authority in clearly dictating the work that's performed and reporting to the local area agency. But that doesn't—Go ahead. The rationale in Pickering had to do with efficiently doing the work and not making every interaction within the workplace a constitutional issue. And so, does that rationale in Pickering apply to the relationship between the state government and the employees in these various local agencies throughout the state? We assert that it does. And if you look at Pickering and sort of the Hatch Act line of cases that we cite that talk about Pickering and talk about regulating public employee conduct, we're talking about Curtis, which is actually pre-Hatch Act, Mitchell— Is there any case that actually does that? Because in the Hatch Act cases, they specifically say that any application to state employees is not before them. So, the Hatch Act cases were only talking about federal employees, at least that was the decision. Are there any cases you can point me to? Yes, Broderick actually dealt with a state regulation on state employees. And in fact— And was it a federal? Was it a federal law applied to state employees or a state law applied to state employees? It was a state law employed to state employees. So, the question is, here we have a state law applied to local employees, and are there any cases where there is a difference in the government level so that the employees were not directly working for the entity issuing the rule? We don't have a clear case directing that scenario, but we do have Pickering and the Hatch Act line of cases which fit pretty closely because it is still the government regulating conduct of public employees. Could the federal government then, could they say, here's a rule that's applicable to local employees? Well, a federal government making that type of rule, I don't know what, depending on what the rule is and what they were trying to regulate, they may have that authority regulated. They do, in fact, with regard to people who are funded by federal funds. And that's true as to the state and local employees. That's correct. The Hatch Act does apply to those. So, therefore, one of the rationales that you've given for the distinction, which is that some of the state employees are covered by federal rules, isn't a distinction at all because some of the local employees are covered by federal rules too. That is true. Some are, but many, many aren't. Right, and many of the state employees aren't either, so that's not a reason for taking away the regulation from state, although it was given as a reason in your briefing, it's not a reason. That's correct, Your Honor. But I think if you look at holistically, which the court should do here, I would like to point out that in their briefing, they suggested that there must be substantial evidence to justify this regulation. Let me ask you something else. The reason that you're giving for the distinction, I mean, doesn't light up either with the Pickering analysis because it isn't a reason having to do with disruption in the workplace or anything like that. I mean, unlike in the Hatch Act cases where you were talking directly about the substance of the regulation, again, you're talking about some structural problem, which it doesn't seem to me really fits very well with Pickering either. So the question is, if it's not Pickering, what is it? Well, I will answer that, Your Honor. And does it matter? I don't think it matters. I think if you do apply intermediate scrutiny, as the district court did, Judge Gillum said, even if we apply the heightened standard that appellate suggests, he still found that there was an important state interest that was addressed by Section 3205. And what's the important state interest for the distinction? For the distinction? Well, he felt, and I think this is correct, I think that the important state interest is not necessarily for the distinction, but it's to regulate a category of conduct in a population that the state has authority to regulate. Let me just get to the interest for a moment. So in Williams-Uley, the courts said that for solicitation of funds, as opposed to other sorts of political speech, there had to be a compelling interest to stop solicitation of funds. The court said there was such a compelling interest. It was an interest in judicial integrity. So what's the compelling interest in stopping solicitation of funds here? The compelling interest to sort of prohibit the solicitation of funds, I think there are multiple. The fact that the state has a right to sort of protect the First Amendment rights of the targeted employees, those that, because there's coercive pressure for them to maybe make a out of fear of not... So it's to protect the First Amendment rights of other employees, is that what you're saying is a compelling interest, to stop speech in order to protect somebody else's rights? That is one of them, yes. Was Williams versus Uley actually, was the majority for the strict scrutiny standard? It did apply the strict scrutiny standard. That was a plurality. Excuse me, Your Honor? That was a plurality of the court. I believe it was a plurality decision, but it did apply strict scrutiny, which is... But there was not a majority for that holding. Is that right? I believe that's correct, Your Honor. I'd have to go back and look at it, but my recollection is that it was a plurality decision. It was a majority decision, but as to the standard issue, I believe it was... As to which standard applied, that's correct. So what other compelling interest or important interest is there besides protecting the First Amendment rights of employees by stopping the speech of other employees? Okay, maintaining a coercion-free workplace, public trust in government, avoiding the return to political patronage system, ensuring that government agency employees perform their taxpayer-funded activities. All of those interests have been recognized in a variety of Supreme Court cases saying that those are important state interests that the state can regulate conduct in. Those were identified in Broderick and letter carriers. Again, that's not really an issue here. The question is the distinction. Don't you need to have... On your theory, wouldn't you need to have a compelling interest in the distinction? Well, the plaintiffs here aren't a protected class, so they don't necessarily get to say, okay, you have a right to regulate this conduct. But this is First Amendment activity. It is First Amendment activity. We're looking at it through a First Amendment rubric, not through an equal protection rubric. Why doesn't the case law support the conclusion that whether it's a compelling interest or a stronger interest, whatever it is, it has to be related to the differential and not to the underlying reasons? Because I think if you look at... Different speakers differently under the First Amendment, which was its own problem. Or is it just that it's under-inclusive? And how would we address this under-inclusivity so it only includes one group and not another? I'm not sure that it has to be a distinction because there's at least some case law saying that Congress... One group at a time. Why isn't this under-inclusive, which would undermine the narrow tailoring? Well, I don't... I'm not sure that it is under-inclusive. I mean, they attempt to make an argument that it was under-inclusive because it didn't restrict the conduct of state employees as well. But in their complaint, they don't assert an over-breath challenge or an under-inclusive challenge. They ask for an as-applied distinction and treatment as applied. And I don't think... I'm sorry, I don't understand what that means here. I'm sorry, Your Honor? It's not an over-breath question. It's the fact that the statute makes a... And the omission from the statute makes a distinction between speakers. It's like Mosley or Kerry or those cases. You're regulating some people and not other people for saying exactly the same thing in the same circumstances. Those were all in the context of either political contribution or political expenditure cases. No, actually, they weren't. They had nothing to do with... They happened to be picketing cases, but that's okay. Some government commercial speech cases. No, they weren't commercial speech cases. They were pure First Amendment on the street cases. Mosley and Kerry. Go ahead. Mosley. Okay, Mosley. You're correct, Your Honor. Kerry versus Brown is the other one I'm talking about. Okay. So what was the question in there, Your Honor? I'm sorry. They created a rule which has been carried forward that distinguishing between speakers to say exactly the same thing in the same circumstances is its own First Amendment problem. I mean, legislative conduct by its very nature makes sometimes the determinations and Sorry, Your Honor. I lost my train of thought. Their laws necessarily sometimes result in inequality, and that in and of itself doesn't mean it's a constitutional violation. The state here, we assert, had the authority to regulate this field, both for state and local area agency employees. I think everybody agrees that's not contested. But the legislature chose to do a narrow set of regulation just on an area they thought was still problematic, and that's local area agency employees because there was a lack of regulation. There was concerns of corruption, and I think if you look at the collective picture, it supports that. The state only has eight elected officials. The county has roughly 3,500 separate local area agencies, and those are headed by thousands of elected officials. So the problems for coercion and the problems for soliciting campaign contributions within local area agencies that give the perception that there's a political patronage system at the local level is not the same as it is at the state level. It's very different. So the state had a reason for making this distinction, and this court is entitled to look at not only what's in the legislative record, even in cases where strict scrutiny was applied, is applied, the court can use common sense and look at sort of the collective record and what is happening and what the differences are, and that's what we're suggesting the court should do. Well, that's about the first thing you said that actually does go to the substance of the distinction. I don't know how much support there is for it in the record, but at least it is somewhat responsive to the problem. Well, thank you, Your Honor. I believe my time is up, but I'm happy to answer more questions. Okay. Any more questions? Judge Gold? No questions here. Okay. Thank you very much. Thank you, Your Honors. You have some time to respond. I think the key point, Your Honor, in rebuttal, and I don't feel like I need to spend a great deal of time unless the court has further questions, is that the state appears to justify its distinction between state and local employees by the fact that it treats them differently. So finally, at the crux of the problem, the state says that the difference between state and local employees that is relevant to this question is that one of them is subject to more oversight than the other. Well, he just gave another reason, which does seem to me to have more force, if it's supported by the record and accurate, and that is that the nature of local agencies and of local entities means that there are more elections, more elected officials, more closeness probably, but I don't know if we have a record between that. I mean, I suppose in the city of Berkeley, for example, a city of 100,000 or so, the mayor and the city council people and the employees are all in the same building and all dealing with each other, and there is more opportunity for implicit and hard-to-uncover coercion and so on. That's the very last thing he said, and it has some connection to the problem. So what about that? I think there's two responses. First is that it's not supported by the record. Again, I direct the court to pages 134 through 136 on our stipulated facts. But moreover, Section 3205 forbids solicitations for national political campaigns, and state agencies can have as few as four employees doing intimately political work. A judge's chambers is governed by the state regime. All judges in California are state officials, and Los Angeles County is governed by this more restrictive regime. And so I think not only is there no support in the record for the distinction, there's something like the opposite of support in the record for the distinction. Because again, if the concern were the closeness, the proximity between the elected official and sort of the solicitation between that official's employees, state judges would be the primary candidates for that. They all stand for election, other than at the trial court level, and all have staff chambers in which their employees are free on their lunch break or after work to solicit each other for political contributions to a judicial race. And employees of the Attorney General, of course, are free to make similar solicitations at all statewide levels. So the key point is, indeed, if that were the case, if there were support in the record, I think that would be the kind of justification that might be considered by this Court. But there simply is not. So is there anything in the record about the relative size of agencies, state agencies and local agencies, and so on? There is, Your Honor. At page one—excuse me one moment—at page 135 to 136, we list sort of a rough survey of—and these are stipulated facts by the parties. In 58 counties, there are 482 municipalities. That's correct, Your Honor. Doesn't talk about which of those have elected officials or the size of them or anything like that. That's correct, Your Honor. It does not. I believe we discuss—and we can look more closely in a moment—but I believe we discuss state judges, all of whom are individually elected at the trial court level. So to the extent that there's sort of this concern that there are more elections at the as an absolute number of more elections, but it's unclear if there are more elections per office or per employee, which one would think would be the reason here. But in either event, under any plausible standard, the state has to come forward with some reason for the distinction, and the record is silent as to that sort of concern. And again, I think so what we come down to, as Your Honor's first question to me at my opening argument hit at, the state could just do this. There's no reason why the state couldn't employ the same regime, no matter how many elections there are. They could simply say that the rules that are currently passed by CalHR are applicable to local employees as well. This Court doesn't have any further questions. Okay. Thank you very much. Thank both of you for your arguments. And the case of Progressive Democrats v. Bonta is submitted, and we are in recess. Thank you very much.
judges: GOULD, BERZON, IKUTA